STATE OF MAINE
WASHINGTON, SS.

SUPERIOR COURT
Docket No. CR- 15-034

SETH LARKIN,     )
   Petitioner   )
        )
        )
  v.      )  **ORDER DENYING PETITION FOR**
        )  **POST CONVICTION REVIEW**
        )
STATE OF MAINE,   )
   Respondent.  )

This Post-Conviction Review (PCR) matter was transferred from Washington County to Penobscot County in April of 2019. A hearing date was set for August 16, 2019, but was continued for good cause. On October 28, 2019, the matter came before the Court for a testimonial hearing. Petitioner appeared and was represented by Verne Paradie, Esq. DA Foster represented the State. Petitioner requested the opportunity to present a written closing argument, and he did so on or about November 8, 2019. DA Foster responded on or about December 6, 2019. The testimony from the PCR hearing was reviewed in early January 2020.

Petitioner raised six (6) grounds for relief in this Post-Conviction Review proceeding for ineffective assistance of counsel (the initial petition and the amended petition have duplication). In the initial Petition, Petitioner alleged: 1) failure to call witnesses; 2) failure to hire a private investigator; 3) failure to cross-examine a witness to impeach the victim's credibility; and 4) failure to secure evidence from cell phones. In the amended Petition, Petitioner alleged: 1) failure to conduct an adequate pretrial investigation, including failure to obtain text messages between Deserae Apt and Victoria Boone, failure to hire a private investigator, failure to contact witnesses and introduce evidence at the trial; 2) failure to adequately cross-examine Deserae Apt and Victoria Boone; 3) failure to keep the Petitioner informed of developments and discussing

1

potential defenses; and 4) failure to make proper objections at trial. At the PCR hearing, Petitioner added that he believed that his attorney failed to recognize that he was suffering from mental health issues. At the PCR hearing, Petitioner withdrew his allegations that his trial counsel failed to present mitigating circumstances at sentencing and failed to inform him of his right to pursue a PCR.

## STANDARD OF REVIEW

As the Court stated in *Philbrook v. State*,

> Claims of ineffective assistance of counsel raised on post-conviction review are governed by the two-part test outlined in *Strickland v. Washington*, 466 U.S. 688, 104 S. Ct. 2052, 80 L.Ed. 674 (1984). *Middleton v. State*, 2015 ME 164, ¶ 12, 129 A.3d 962. Applying that test, a petitioner bears the burden at the post-conviction trial, of proving the following: (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient representation resulted in prejudice.

2017 ME 162, ¶ 6, 167 A.3d 1266. The *Philbrook* Court continued:

> As to the first part of the *Strickland* test, counsel's representation of a Petitioner falls below the objective standard of reasonableness if it falls below what might be expected from an ordinary fallible attorney. . . .
>
> To establish prejudice – the second part of the *Strickland* test – the post-conviction petitioner must prove that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different, meaning that the ineffective assistance of counsel rose to the level of compromising the reliability of the conviction and undermining confidence in it. A conviction may be unreliable and not worthy of confidence, thus satisfying the reasonable probability test, even without proof that a different outcome was more likely than not, as the now superseded "outcome determinative" test would require.

*Id.* ¶¶ 7-8.

There is a strong presumption that counsel's actions fall within the wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. 688, 689. The PCR Court must not view actions taken in hindsight, but must take into account all the circumstances as

2

known to counsel. *Legassee v. State*, 655 A2d 328, 330 (Me. 1995) (pretrial investigation must be "reasonable"). Additionally, the Court must review trial strategy and judgment calls with a substantially heightened deferential standard. *Levesque v. State*, 664 A.2d 849, 851 (Me. 1995). The Court applies a "manifest unreasonableness" standard when reviewing decisions related to strategy and judgment calls. *Id.*

## ANALYSIS

The Court will address each of the grounds for this Petition.

### 1. Failure to keep Petitioner informed of developments, failure to consult with the Petitioner regarding his defense, and failure to provide Petitioner with accurate information related to his case

Petitioner was held in jail awaiting his trial. Attorney Toffolon met with the Petitioner 16 times in-person at the jail while Petitioner was awaiting trial. Petitioner and Attorney Toffolon also met additional times at court. Attorney Toffolon also communicated by telephone with the Petitioner or his "representatives," particularly Mr. Larkin's mother, 14 times. Additionally Attorney Toffolon sent the Petitioner 10 letters.

Prior to trial, Attorney Toffolon typed out the questions he intended to ask Petitioner and his witnesses at the trial. He then met with the Petitioner to review those questions, and secured Petitioner's input and approval.

The Court finds that Petitioner has failed to prove that defense counsel's communication fell below the objective standard of reasonableness as it did not fall below the performance expected of an ordinary, fallible attorney. The amount and content of the communications was exemplary.

Moreover, even if the performance fell below that expected of an ordinary, fallible attorney, Petitioner has failed to establish that there is a reasonable probability that, but for the

3

counsel's unprofessional errors, the result of the proceeding would have been different, meaning that the ineffective assistance of counsel rose to the level of compromising the reliability of the conviction and undermining confidence in it. Petitioner has not suggested any particular additional communication from Mr. Toffolon that would have been helpful in defense of the charges. Thus, any substandard performance (and the Court does not find any substandard performance) did not compromise the reliability of the conviction or undermine confidence in it.

The Court is fully satisfied that Attorney Toffolon kept Petitioner informed of all developments in the case, consulted with him frequently, and provided him with accurate information. Petitioner has failed to meet his burden of proof on this aspect of his PCR.

2. *Failure to properly object to evidence at trial, including Petitioner's prior criminal record and failure to request a limiting instruction*

Attorney Toffolon made and argued objections to evidence put forth by the prosecution. Attorney Toffolon– in fact – objected to the introduction of Petitioner's prior criminal record at trial. The Court held that "the area of cross examination dealing with the prior convictions would be appropriate under Rule 609...". Therefore, there is no question that the Court engaged in a Rule 609 analysis.

There is nothing in the Petitioner's Petition or Amended Petition addressing the lack of a request for a limiting instruction. Attorney Toffolon testified that he believed the impeachment value of the prior convictions was "reasonably limited" because they were not of a sexual nature. The question of whether or not to request a limiting instruction is a matter of trial strategy, and in certain circumstances it is reasonable to not request limiting instructions lest additional attention is drawn to the convictions. The Court finds first that this issue was not been properly raised in

4

this PCR proceeding and secondly that as a tactical decision it was not "manifestly unreasonable." *See Levesque v. State,* 664 A.2d at 851.

The Court finds that Petitioner has failed to prove that defense counsel's conduct in this regard fell below the objective standard of reasonableness as it did not fall below the performance expected of an ordinary, fallible attorney.

Moreover, even if the performance fell below that expected of an ordinary, fallible attorney, Petitioner has failed to establish that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different, meaning that the ineffective assistance of counsel rose to the level of compromising the reliability of the conviction and undermining confidence in it. Petitioner has failed to carry his burden on this aspect of his PCR.

### 3. Failure to obtain text messages

Petitioner alleged that Attorney Toffolon failed to "get evidence of [his] innocence" from the iphone and US Cellular records. On June 18, 2013, Attorney Toffolon wrote a letter seeking cell phone records.

Attorney Toffolon in fact obtained certain information from cell phones. The evidence at the PCR hearing included two pages of text messages, which may have been part of discovery. These text messages appear to be between Victoria Boone and Autumn Francis. Attorney Toffolon believed that he attempted to secure additional records, but given the limited storage of cell phone records at that time (2013), he was not able to do so.

The Court finds that Petitioner has failed to prove that defense counsel's conduct with respect to securing cell phone records fell below the 2013 objective standard of reasonableness as it did not fall below the performance expected of an ordinary, fallible attorney.

5

Moreover, even if the performance fell below that expected of an ordinary, fallible attorney, Petitioner has failed to establish that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different, meaning that the ineffective assistance of counsel rose to the level of compromising the reliability of the conviction and undermining confidence in it. Petitioner has failed to carry his burden on this aspect of his PCR.

### 4. *Failure to hire a private investigator/Failure to contact witnesses*

Petitioner argued that Attorney Toffolon provided ineffective assistance of counsel in that he failed to hire a private investigator. Petitioner suggested he wanted a private investigator to "find the truth."

Attorney Toffolon prefers to interview witnesses -- in a case like this -- himself, rather than through a private investigator. During his interviews he wishes to evaluate whether a witness will actually help or hurt his client's case. Attorney Toffolon made telephone calls or held meetings during which he attempted to contact and/or did have contact with potential witnesses. He did so on 13 occasions.

With respect to Autumn Francis, Petitioner's cousin, Attorney Toffolon made contact with Ms. Francis before the trial, made an appointment for Ms. Francis to meet with him in his office, but Ms. Francis did not attend the appointment. However, despite this, Attorney Toffolon was able to interview Ms. Francis during the trial and obtained information from her that he attempted to introduce into evidence. Attorney Toffolon made an offer of proof regarding this proposed testimony; however, the trial court excluded such testimony[1].

---

[1] On February 24, 2015, the Law Court held that the trial court did not abuse its discretion in excluding certain hearsay testimony offered by Mr. Larkin.

6

One particular point made by the Petitioner was that had Attorney Toffolon interviewed a witness and had that witness been called to testify and testified differently than what he/she had communicated to Attorney Toffolon, then Attorney Toffolon would be in a difficult position. However, this hypothetical situation did not develop.

The Court finds that Petitioner has failed to prove that defense counsel's handling of the pretrial investigation fell below the objective standard of reasonableness as it did not fall below the performance expected of an ordinary, fallible attorney.

Moreover, even if the performance fell below that expected of an ordinary, fallible attorney, Petitioner has failed to establish that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different, meaning that the ineffective assistance of counsel rose to the level of compromising the reliability of the conviction and undermining confidence in it. Petitioner has not established any specific information a private investigator would have generated that would have been helpful in defense of the charges. Thus, any substandard performance (and the Court does not find any substandard performance) did not compromise the reliability of the conviction or undermine confidence in it.

### 5. *Failure to call witnesses/Failure to contact witnesses and introduce evidence at trial*

Mr. Larkin has suggested that Mr. Toffolon did not call necessary witnesses. In particular, Mr. Larkin suggested that Autumn Francis should have been called as a witness. In fact, Attorney Toffolon attempted to call Autumn Francis to testify about text messages she received from Victoria Boone. As noted above, after a proffer of the anticipated testimony, the Court ruled that such testimony would be hearsay and not subject to an exception[2].

---

[2] On February 24, 2015, the Law Court held that the trial court did not abuse its discretion in excluding certain hearsay testimony offered by Mr. Larkin.

7

At the PCR hearing, Mr. Larkin also testified that Saucony Apt and Diahnie Altvater should have been called as witnesses at his trial. According to Mr. Larkin, he understands that Saucony Apt told Defendant's mother that Deserae Apt told Saucony Apt that Mr. Larkin did not sexually assault her. Mr. Larkin further understands (apparently through a third-party) that Diahnie Altvater would have testified that Desarae Apt told Altvater that Mary Mitchell's intent was to get Mr. Larkin "locked up."

Mr. Toffolon testified that *if* Mr. Larkin mentioned these potential witnesses to him, then he reached out to them. Mr. Toffolon did not recall that Saucony Apt was mentioned to him by the Petitioner. Mr. Toffolon was not asked specifically about Diahnie Altvater.

However, neither Saucony Apt nor Diahnie Altvater (whose testimony may or may not have been admitted) testified at the PCR hearing. Thus, it is unknown whether they actually had the information about which Mr. Larkin heard. Additionally, Mr. Larkin did not produce any other evidence at the PCR hearing, other than his own testimony, to establish that he told Mr. Toffolon about these potential witnesses. Given the purported nature of Saucony Apt's testimony, it is difficult to imagine that Mr. Larkin would not have repeatedly talked with Attorney Toffolon about this potential witness during the pre-trial preparation and during trial, and that if Mr. Larkin did so, that Mr. Toffolon would not recall it.

The Court finds that Mr. Larkin has failed to establish that he told Attorney Toffolon about Saucony Apt or Diahnie Alvater before or during his trial.

The Court finds that Petitioner has failed to prove that defense counsel's calling of necessary witnesses fell below the objective standard of reasonableness as it did not fall below the performance expected of an ordinary, fallible attorney.

### 6. *Failure to adequately cross-examine Deserae Apt and Victoria Boone*

The underlying charges in this case were Gross Sexual Assault (class A) and Unlawful Sexual Contact (class C). The Gross Sexual Assault charge alleges that Deserae Apt was the victim, and the Unlawful Sexual Contact charge alleges that Victoria Boone was the victim. With respect to the Gross Sexual Assault charge, Mr. Larkin's defense was that the act was consensual. With respect to the Unlawful Sexual Contact charge, Mr. Larkin's defense was that the sexual act did not occur. Thus, the credibility of each of the victims was squarely at issue.

During the trial, Ms. Apt testified on direct that:

a. She said "no" to showing Mr. Larkin her breasts in the first instance;

b. She said "no" to Mr. Larkin's request that she "lick" his penis;

c. She did not say "no" to showing Mr. Larkin her breasts after she returned upstairs;

d. She told him to get off her; and

e. She told him "to stop" when he pulled her pants down.

However, the police report recites that: 1) "Apt advised she had not said 'no' but had resisted but was scared of Larkin," and 2) "she advised Larkin was being aggressive and she was afraid to say "no" as she knew he had a violent past." (See Petitioner's Exhibit 2). It is somewhat unclear from the police report exactly when in the series of events at issue that Ms. Apt did not say "no." The police report is a narrative in the officer's words, and does not contain any recorded statement by Ms. Apt[3].

Whether the content of the cross-examination fell below the standard of care requires close analysis.

---

[3] The interview of Deserae Apt by law enforcement was recorded, but the recording was not produced because it had been recorded over. Moreover, it appears that Attorney Toffolon had hand-written statements from Ms. Apt and Ms. Boone that are not part of the PCR record. It is unknown whether Ms. Apt made any representations in her own statement whether she said "no" or "stop" at any relevant times. Mr. Toffolon testified that he believed the testimony of the witnesses was consistent with their written statements.

9

There is no question that aggressive cross-examination of a young alleged victim in a sexual assault case may do more harm than good for a Defendant. It is clear from the trial transcript that Ms. Apt was a very soft-spoken witness. Cross-examining a soft-spoken, non-combative alleged victim of sexual assault requires tactical decisions.

The cross-examination of Ms. Apt at trial highlighted areas which could cause a jury to question Ms. Apt's credibility. In particular, during cross-examination Ms. Apt testified that her memory of the events in question would be better closer to the event than at trial. She further testified that she left out some major details about the incident in her statement to the police (TT 97 – 98). She further testified that she "didn't remember" whether she had included in her statement to the police that she told Mr. Larkin "to stop." (TT 99, line 6). Moreover, when Attorney Toffolon recalled Ms. Apt, he elicited testimony that Ms. Apt allowed Mr. Larkin to assist her in painting her toenails and that this contact was consensual (TT 223-225).

The difference between Ms. Apt telling the police she had not told Mr. Larkin "no" and her in-court testimony that she told Mr. Larkin "to stop" could have been explored during cross-examination. However, "no" and "stop" are not identical words, this inconsistency would be limited to the officer's interpretation of Ms. Apt's verbal statements (not her recorded words or her own written words), and the moment she did or did not say "no" or "stop" is open to some debate.

Finally, an attorney cannot point out one aspect of a statement that is favorable to his client without risking that the entire statement will become known to the jury. As noted earlier, Ms. Apt's statement to the police indicated that she was afraid to say "no" because she knew Mr. Larkin had a violent past. Thus, if the potential inconsistency between Ms. Apt's trial testimony (that she said "no" and/or "stop" at some points) and her statement to the police (that she did not say "no") had been part of cross-examination, there is every reason to believe that Ms. Apt's

10

entire statement to the police that "she was afraid to say no as she knew he [Mr. Larkin] had a violent past" would have been admitted for the jury's consideration.

On the day of the Gross Sexual Assault, Ms. Apt had a boyfriend. During his cross-examination, Mr. Toffolon confirmed with Ms. Apt that she had a boyfriend and questioned her about the length of time the relationship continued after the date in question. This line of questioning could cause a jury to consider whether Ms. Apt might be asserting that Mr. Larkin's contact was nonconsensual to protect her relationship with her boyfriend.

On cross-examination, Victoria Boone confirmed her telephone number at the time of these events. This set up the potential for admission of certain text messages. Although Attorney Toffolon attempted to introduce evidence of text messages sent from this phone, the trial court excluded such evidence. Moreover, through Attorney Toffolon's direct examination of Mr. Larkin, the jury was presented with evidence of Victoria Boone's background.

The Court is not persuaded that the length of cross-examination as compared to the length of direct examination is probative of the PCR issues.

Petitioner also argued that Attorney Toffolon did not ask Ms. Boone if she (Ms. Boone) thought Ms. Apt was "lying." This would not be a proper line of inquiry.

Certain tactical decisions must be made by defense counsel as the trial unfolds[4]. The extent of cross-examination falls within defense counsel's strategic decision-making and making of a judgment call. The Court reviews tactical decisions for "manifest unreasonableness." *Levesque v. State*, 664 A.2d at 851. Under all of the circumstances, the Court is satisfied that cross-examination fell within the bounds of that which would have been conducted by a

---

[4] Additionally, all along Mr. Larkin intended to testify and did testify to his position that his contact with Ms. Apt was consenual and his position that he did not have any contact with Ms. Boone.

reasonable attorney, that it did not fall below the performance expected of an ordinary, fallible attorney, and that it was not manifestly unreasonable not to conduct further cross-examination into the areas suggested by the Petitioner on his PCR.

### 7. *Failure to recognize that Petitioner was suffering from mental health issues that interfered with his judgment or decision making*

This issue was not raised in the PCR, but the Court will address the issue as a matter of completeness.

Petitioner testified that he believed that he went through a "state of psychosis" while at the Washington County Jail. He further testified that he did not feel ready to go to trial, meaning that his "mind wasn't there." He also testified that he was "heavily mediated" but was "kind of aware" of what was going on. The Court does not accept this this testimony.

Attorney Toffolon testified that he had a great deal of contact with the Petitioner in the pre-trial phase, both in-person and in writing. Petitioner was also present with Attorney Toffolon throughout the trial. Attorney Toffolon testified that he observed that the Petitioner appeared to be a person "who had his stuff together." Attorney Toffolon believed that Mr. Larkin had the capacity to easily comprehend each and every step of the trial process. Attorney Toffolon was familiar with the Title 15 process and did not see any reason to request a Title 15 examination in this case. Furthermore, Petitioner never mentioned anything to Attorney Toffolon that suggested he was having any type of mental health issue that affected his judgment. Finally, Petitioner expressed to Attorney Toffolon that he was ready for trial.

The Court is not satisfied that Petitioner was suffering from any mental health issues that interfered with his judgment or decision making. While Petitioner may wish that he exercised judgment differently or that he made different decisions, the Court is not satisfied that the way he exercised judgment or made decisions was affected by any mental health difficulties. Therefore,

12

Petitioner has failed to prove that defense counsel's awareness of his mental health condition fell below the objective standard of reasonableness as it did not fall below the performance expected of an ordinary, fallible attorney.

**Conclusion**

The Court is fully satisfied that trial counsel's performance was <u>not</u> constitutionally ineffective. Therefore, the Petition is denied.

The Clerk shall enter this Order denying the Post-Conviction Petition upon the docket by reference pursuant to M.R.U. Crim. P. 53(a).

Dated:  1·16·2020

_____
Ann M. Murray, Justice
Maine Superior Court

13